## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| APRYL KAYLOR ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 21-01164-BAH |
| JUAN A. ARRISUENO, M.D. ET AL., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

This is a medical malpractice case arising out of Plaintiff Apryl Kaylor's onset of necrotizing fasciitis of the left arm and the alleged negligence of medical professionals at the UPMC Western Maryland Corporation (the "UPMC Hospital"), whose medical decisions allegedly resulted in a delay in Ms. Kaylor receiving the correct diagnosis and required surgical intervention.[1] ECF 1, at 5–8 ¶¶ 10–17. Ms. Kaylor and her spouse, Stephen Kaylor, brought suit against numerous medical professionals at the UPMC Hospital and the UPMC Hospital itself, alleging Defendants' negligent failure to diagnose Ms. Kaylor's necrotizing fasciitis caused her permanent disability and loss of consortium[2] to Mr. Kaylor. *Id.* at 4, 17.

---

[1] Jurisdiction is proper based upon diversity of citizenship. 28 U.S.C. § 1332(a). Plaintiffs are citizens of West Virginia, and all Defendants are citizens of Maryland. *See* ECF 1, at 3 ¶¶ 1–2. Additionally, Plaintiffs have alleged the amount in controversy exceeds $75,000. *Id.* at 16 ¶ 37.

[2] "[L]oss of consortium . . . means the 'loss of society, affection, assistance and conjugal fellowship. It includes the loss or impairment of sexual relations." *Owens-Illinois, Inc. v. Cook*, 872 A.2d 969, 980 (Md. 2005) (quoting *Deems v. W. Md. Ry. Co.*, 231 A.2d 514, 517 (Md. 1967)). "A loss of consortium claim is derivative of the injured spouse's claim for personal injury." *Id.* (citation omitted). While Plaintiffs did not use the term loss of consortium in the complaint, it is clear this is the claim Plaintiffs assert. *See* ECF 1, at 17–18 ¶¶ 1–4 (alleging in Count II that

Defendants include Juan A. Arrisueno, M.D. ("Dr. Arrisueno"), Robert Daniel Flint, Jr., M.D. ("Dr. Flint"), Pete Allen Kuhn, NP-C ("Mr. Kuhn"), Ravi Teja Pilla, M.D. ("Dr. Pilla"), Diana L. Pepe, CRNP ("Ms. Pepe"), Christine Sensabaugh, M.D. ("Dr. Sensabaugh"), Rameet Thapa, M.D. ("Dr. Thapa"), Richard O. Addo, M.D. ("Dr. Addo"), Mohammed Zulfequar Ali, M.D. ("Dr. Ali"), and the UPMC Hospital. ECF 1, at 1.

All the above Defendants, except Dr. Arrisueno, Dr. Thapa, and the UPMC Hospital, brought the present motion for summary judgment. ECF 86; ECF 89-1, at 6 n.1. For simplicity, I will refer to the movant Defendants of ECF 86 (Drs. Flint, Pilla, Sensabaugh, Ali, and Mr. Kuhn and Ms. Pepe) as "Movants." Pending before the Court is Movants' Motion for Summary Judgment (the "Motion"). ECF 86. Plaintiffs filed an opposition, ECF 89, and Movants filed a reply, ECF 90. All filings include memoranda of law and exhibits.[3] I have reviewed all relevant filings and find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons stated below, Movants' Motion is **DENIED**.

## I.   **BACKGROUND**

Necrotizing fasciitis is a deep soft tissue infection, ECF 86-1, at 5, that is "a Class 1 emergency," which, as defined by one of Plaintiffs' experts, is an emergency in which "life and limb are at stake." ECF 89-30 (Dr. Freed deposition), at 3, 75:10–12. Its fast progression requires surgical intervention and "[t]he earlier you operate the less tissue there is lost and the more likely it is that the patient will return to full function in the future." *Id.* at 4, 86:5–8; ECF 89-29 (Dr. Freed declaration) ¶ 9; ECF 86-1, at 5 (conceding as such). Ms. Kaylor's expert witnesses will

---

Defendants' negligence and the resulting pain Ms. Kaylor experiences has caused "interrupt[ions]" and "damage[]" to "their marriage and marital relationship," and has damaged Ms. Kaylor's "ability to function as a normal wife").

[3] I refer to all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

2

opine that the standard of care for this condition requires a medical professional, upon a reasonable suspicion of the condition, to order urgent imaging and an emergency surgical consultation. *See, e.g.*, ECF 89-26 (Dr. Takhar deposition), at 3, 84:7–13. The experts will opine that a reasonably prudent medical professional would have had a "high suspicion for [necrotizing fasciitis]" based on Ms. Kaylor's clinical and laboratory presentation and that a reasonably prudent medical professional would have acted quickly to assess and diagnose the condition. *See, e.g.*, ECF 89-25 (Dr. Alan Van Opstal deposition), at 3, 73:17–21; ECF 89-27 (Dr. Itskowitz deposition), at 12, 126:9–12.

As the timeline of Ms. Kaylor's necrotic infection is important to Movants' causation arguments, I will briefly summarize the four days of treatment Ms. Kaylor received at UPMC Hospital, followed by Ms. Kaylor's eventual surgical treatment at a different hospital on the fifth day.

### A.   April 7, 2020: Ms. Kaylor is admitted to the emergency room displaying signs of necrotizing fasciitis.

On April 7, 2020, at 10:57 a.m., Ms. Kaylor presented to UPMC Hospital with complaints of left-hand swelling, pain, and an inability to move her fingers. ECF 1, at 8 ¶ 18. Ms. Kaylor indicated that she had begun experiencing these symptoms for three days prior to visiting the emergency room and that her symptoms had progressively worsened. *Id.* Ms. Kaylor's expert witness, Dr. Jeffrey Freed, will opine that that Ms. Kaylor "had necrotizing fasciitis at the time she presented to [UPMC Hospital]," ECF 89-29 ¶ 8, and that she should have received surgery on or about the 7th, or immediately thereafter, ECF 89-30, at 5, 97:14–98:14.

Ms. Kaylor was first examined by Mr. Kuhn, a registered nurse practitioner and expert in emergency medicine. ECF 1, at 8 ¶ 18; ECF 86-2, at 1 (Mr. Kuhn notes). Mr. Kuhn noted "red streaking up the volar aspect [or palm side] of [Ms. Kaylor's] left arm extending to the elbow," as

3

well as "redness," "swelling of [her] left hand" and the appearance of "bullae [or blisters] to the left hand," ECF 86-2, at 1–2.[4]  Mr. Kuhn also observed "lymphangitis that extend[ed] from the hand up to the elbow," and decreased movement with normal sensation of the fingers.[5]  *Id.*  Mr. Kuhn documented that Dr. Flint, an expert in emergency medicine, "contacted the hospitalist and discussed [Ms. Kaylor] with him."  *Id.*  Dr. Flint also examined Ms. Kaylor, ECF 89-6 (Dr. Flint notes), and ordered "appropriate diagnostic testing."  ECF 86-2, at 4.  Ms. Kaylor's "Final [Emergency Department] Diagnosis" was: "Fever[,] Leukocytosis[,] Left hand vasculitis[, and] Left hand cellulitis."[6]  *Id.*  Ms. Kaylor was admitted for further treatment.  *Id.*

Plaintiffs allege that Ms. Kaylor's clinical presentation was "consistent with necrotizing fasciitis, which should have been included on a differential diagnosis and pursued."[7]  ECF 1, at 9

---

[4] *See Bullae*, MedlinePlus, https://medlineplus.gov/ency/article/003239.htm (last visited Apr. 19, 2024) ("Bullae are large blisters on the skin that are filled with clear fluid."); *Volar*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/volar (last visited Apr. 19, 2024) (defining volar as "relating to the palm of the hand[.]").

[5] *Lymphangitis*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/25234-lymphangitis (last visited Apr. 19, 2024) ("Lymphangitis is inflammation of [the] lymph vessels. Lymph vessels . . . transport lymphatic fluid away from tissues and deliver it back into your bloodstream.").

[6] "Leukocytosis means you have a high white blood cell count."  *High White Blood Count*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17704-high-white-blood-cell-count (last visited Apr. 19, 2024).  "Vasculitis involves inflammation of the blood vessels." *Vasculitis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/vasculitis/symptoms-causes/syc-20363435 (last visited Apr. 19, 2024).  Cellulitis is a "bacterial skin infection." *Cellulitis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762 (last visited Apr. 19, 2024).

[7] A differential diagnosis is "a list of conditions that share the same symptoms [that] help make a final diagnosis."  *Differential Diagnosis*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/22327-differential-diagnosis (last visited Apr. 19, 2024).

¶ 19.  However, neither Dr. Flint nor Mr. Kuhn obtained a STAT[8] surgical consultation, a STAT CT[9] or an MRI scan.[10]  *Id.*; *see also* ECF 86-2, at 1–4; ECF 89-6, at 2.  Dr. Alan Van Opstal will opine that Dr. Flint and Mr. Kuhn breached the applicable standard of care in this manner.  ECF 89-25, at 5, 95:9–15; *see also* ECF 89-26, at 3–4, 84:4–97:17 (opining that Mr. Kuhn and Dr. Flint breached the standard of care in the same manner).

At 2:05 p.m. on April 7, 2020, after Ms. Kaylor was moved to a different unit, she was examined by Dr. Pilla, an expert in hospital medicine.  ECF 1, at 9 ¶ 20; ECF 89-7 (Dr. Pilla notes). Dr. Pilla noted Ms. Kaylor's past medical history, her laboratory results, and her clinical condition in the emergency department before opining that Ms. Kaylor was "[s]ep[tic] [with] no clear source of infection."  ECF 89-7, at 2, 5.  Dr. Pilla suspected that her "leukocytosis . . . could be reactive secondary to a [venous thromboembolism]."  *Id.* at 5.  Dr. Pilla indicated her condition was "very concerning for DVT" so he placed her on "Lovenox for therapeutic anticoagulation."[11]  *Id.*  Dr. Pilla ordered an "upper extremity duplex, [which was] negative," and a "chest X-ray."  *Id.*  Dr. Pilla planned to "have [Ms. Kaylor] on broad-spectrum antibiotics," "[c]ontinue IV fluids," and

---

[8] "A STAT order is an order to be done immediately."  *Adventist Healthcare, Inc. v. Mattingly*, 223 A.3d 1025, 1029 n.5 (Md. App. 2020).

[9] "'CT' is the abbreviation for a computed tomography, which is 'imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane.'"  *Rodriguez v. Clarke*, 926 A.2d 736, 738 n.2 (Md. 2007) (quoting Stedman's Medical Dictionary 468, 1996 (28th ed. 2006)).

[10] "An MRI is magnetic resonance imaging[.]"  *Copsey v. Park*, 160 A.3d 623, n.3 (Md. 2017) (noting "these procedures use a magnetic field, radio waves and a computer to create detailed images . . . to distinguish normal, healthy tissue from diseased tissue" (citation omitted)).

[11] "DVT" is an abbreviation for deep vein thrombosis.  *Deep vein thrombosis (DVT)*, May Clinic, https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/diagnosis-treatment/drc-20352563 (last visited Apr. 19, 2024).

"avoid [radiographic] contrast until further improvement in [Ms. Kaylor's] kidney function." *Id.*

Dr. Pilla's notes do not indicate that he suspected necrotizing fasciitis. *Id.* Further, Dr. Pilla's

notes indicate he did not order CT imaging of Ms. Kaylor's arm, or a surgical consultation. *See*

*id.*

Plaintiffs allege that Dr. Pilla breached the applicable standard of care by failing to

evaluate, assess, diagnose, and treat Ms. Kaylor for necrotizing fasciitis when she presented with

signs and symptoms of this illness. ECF 1, at 5 ¶ 10, 10 ¶ 22. Plaintiffs' expert Dr. Itskowitz will

opine that Dr. Pilla breached the standard of care in this manner. ECF 89-27, at 5, 77:14–78:1.

### B. April 8, 2020: Ms. Kaylor's symptoms worsen and a CT scan is ordered, though not on a STAT basis.

On April 8, 2020, Ms. Kaylor was examined by Dr. Sensabaugh, an expert in hospital

medicine. ECF 1, at 10 ¶ 23; ECF 89-8 (Dr. Sensabaugh dictation). Dr. Sensabaugh concluded

that Ms. Kaylor was suffering from "[s]epsis secondary to cellulitis." ECF 89-8, at 3. Dr.

Sensabaugh requested "consult[ations] with infectious disease as well as plastics." *Id.* Dr.

Sensabaugh indicated Ms. Kaylor "may benefit at least from a CT, but . . . [that Dr. Sensabaugh]

w[ould] discuss with Infectious Disease and plastics first." *Id.* Pursuant to Dr. Sensabaugh's

consultation request, during the afternoon of April 8, 2020, Ms. Kaylor was examined by Dr.

Thapa, an expert in infectious disease medicine. ECF 1, at 10–11 ¶ 24. Plaintiffs allege Dr.

Sensabaugh "negligently failed to request a STAT surgical consultation, negligently failed to order

a STAT CT while waiting for surgery to arrive, and negligently failed to rule in or rule out the

necrotizing fasciitis from which [Ms. Kaylor] suffered." ECF 1, at 10 ¶ 23.

Dr. Thapa observed Ms. Kaylor's worsening symptoms which included "constant, severe

pain and redness of her entire upper extremity which was exacerbated by movement." *Id.* at 11 ¶

24. Dr. Thapa noted "prominent blister formation and erythematous patches on [Ms. Kaylor's]

6

left hand." *Id.* Finally, he noted that Ms. Kaylor continued to be febrile, tachycardic, tachypneic, and hypotensive despite the administration of antibiotics.[12] *Id.* Dr. Thapa opined that Ms. Kaylor had "sepsis secondary to left upper extremity cellulitis," and planned to continue the antibiotic coverage. *Id.* Additionally, Dr. Thapa was the first medical professional to consider the possibility that Ms. Kaylor's condition could be necrotizing fasciitis and recommended a CT scan. *Id.* Ms. Kaylor alleges Dr. Thapa negligently failed to recommend that imaging study on a STAT basis and failed to recommend a STAT surgical consultation.[13] *Id.*

After Dr. Thapa's consultation, at approximately 3:30 p.m., Dr. Sensabaugh ordered a CT scan of Ms. Kaylor's left forearm. *Id.* ¶ 25. Dr. Sensabaugh allegedly failed, however, to order the CT scan on a STAT basis and failed to obtain a STAT surgical consultation.[14] *Id.* By the end of Ms. Kaylor's second day of hospitalization, she had not yet received a CT scan or surgical consultation. *See* ECF 1 at 10 ¶ 23. Dr. Itskowitz will opine that Dr. Sensabaugh breached the standard of care in this manner. *See* ECF 89-27, at 7–9, 97:5–102:15 (opining that "[i]t was [Dr. Sensabaugh's] responsibility to get a surgeon to the bedside to see this patient on the 8th and to take this patient emergently to the operating room" and "prior to leaving at 7 p.m. on the 8th, Dr.

---

[12] "Tachycardia is a heart rate that's faster than normal[.]" *Tachycardia*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22108-tachycardia (last visited Apr. 19, 2024). "Tachypnea is quick, shallow breathing." *Tachypnea*, Cleveland Clinic, https://my.clevelandclinic.org/health/symptoms/24124-tachypnea (last visited Apr. 19, 2024).

[13] Dr. Thapa is not a Movant, ECF 86, and his alleged negligence is not subject to this Motion, but Plaintiffs' allegations against Dr. Thapa are included here for narrative clarity.

[14] It also appears from the record that Ms. Kaylor did not receive a plastic surgery consultation because there were no on-call plastic surgeons from April 8, 2020, through April 14, 2020. *See* ECF 89-11, at 2.

Sensabaugh was required to make sure that the CT scan was done, and that the surgeon had evaluated the patient").

### C. April 9, 2020: Ms. Kaylor's pain worsens, an urgent CT scan is ordered, a non-urgent surgical consultation is performed, and no medical professional diagnoses her illness.

On April 9, 2020, at 12:47 a.m., Dr. Ali, an expert in infectious disease, saw Ms. Kaylor due to her acute worsening left arm pain despite the administration of narcotic pain medicine. ECF 1, at 11–12 ¶ 26; ECF 89-13 (Dr. Ali notes). Dr. Ali noted "areas of induration in large patches," as well as "bullous areas on her wrist."[15] ECF 89-13, at 2. Dr. Ali noted a "palpable [pulse] in the radial artery" without "signs of compartment syndrome"[16] and indicated that he could not rule out "NF."[17] *Id.* As such, Dr. Ali ordered urgent CT imaging, *id.*; however, Ms. Kaylor alleges that Dr. Ali negligently failed to order a surgical consultation on a STAT basis. ECF 1, at 11–12 ¶ 26; *see also* ECF 89-13, at 2 (noting Ms. Kaylor "will need surgery consult for fasci[o]tomy or debridement"). Plaintiffs' expert Dr. Elizabeth Van Opstal will opine that Dr. Ali breached the standard of care in this manner. *See* ECF 89-28 (Dr. Elizabeth Van Opstal deposition), at 7–9, 85:3–90:7.

At 2:50 a.m., Ms. Kaylor received a CT scan of her left arm with contrast. ECF 1, at 11–12 ¶ 26. It was not dictated by a radiologist until approximately 8:00 a.m. *See* ECF 89-28, at 8, 87:13–88:2. The imaging revealed "subfascial fluid surrounding the muscles from the distal mid-

---

[15] "Skin induration is a deep thickening of the skin[.]" Sherry Christiansen, *Induration Skin Hardening Signs and Causes*, Verywellhealth (Sept. 8, 2023), https://www.verywellhealth.com/induration-skin-5111867.

[16] "Compartment syndrome is a painful buildup of pressure around your muscles." *Compartment Syndrome*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15315-compartment-syndrome (last visited Apr. 19, 2024).

[17] Neither party appears to contest that Dr. Ali was referring to necrotizing fasciitis when using the abbreviation "NF." *See* ECF 1, at 11 ¶ 26; ECF 86-1, at 2–3.

humerus, subcutaneous edema, enlarged lymph nodes, intact vascular structures, without evidence of DVT or formed abscesses," which Plaintiffs allege is consistent with necrotizing fasciitis.[18] ECF 1, at 11–12 ¶ 26. Plaintiffs allege the CT scan imaging should have alerted the Defendants of Ms. Kaylor's need for emergency surgical intervention.[19] *Id.*; *see also* ECF 89-27, at 6, 79:14–16 (opining that "the presence of fluid inflammation in the muscle layer would be concerning for a necrotizing soft tissue infection").

Nearly twelve hours later, at 2:23 p.m., Ms. Kaylor was seen by Dr. Arrisueno, an expert in general surgery. ECF 1, at 12–13 ¶ 27; ECF 89-16 (Dr. Arrisueno's surgery consultation report). Dr. Arrisueno noted that Ms. Kaylor was displaying "increase[d] swelling and blisters on [her] left hand," and he observed "[e]dema, redness, and bullae to the left hand" as well as "[m]ultiple dry skin lesions." ECF 89-16, at 2. Plaintiffs allege Dr. Arrisueno negligently failed to diagnose Ms. Kaylor with necrotizing fasciitis, though her "clinical signs, laboratory results, and CT scan results" were consistent with that diagnosis. ECF 1, at 11–12 ¶ 27. Dr. Arrisueno concluded that Ms. Kaylor was suffering from "[b]ilateral skin dermatitis progressing to cellulitis of [her] left hand."[20] ECF 89-16, at 3. Dr. Arrisueno "[unroofed] two blisters" on Ms. Kaylor's hand, obtained cultures and ordered the application of Silvadene cream. *Id.* Plaintiffs allege this treatment was insufficient to treat Ms. Kaylor's necrotizing fasciitis. ECF 1, at 12–13 ¶ 27.

---

[18] "Edema is swelling caused by fluid trapped in your body's tissues[.]" *Edema*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/12564-edema (last visited Apr. 19, 2024).

[19] A CT cannot confirm a diagnosis of necrotizing fasciitis, but in some instances, it can rule the condition out. ECF 89-27, at 10, 110:6–8. Only surgical exploration in the operating room can definitively establish necrotizing fasciitis. *Id.*

[20] "Dermatitis is a general term for conditions that cause inflammation of the skin." *Dermatitis*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/4089-dermatitis (last visited Apr. 19, 2024).

Additionally, Ms. Kaylor alleges Dr. Arrisueno was negligent for failing to diagnose her true condition, failing to immediately take her to the operating room for STAT surgical intervention, failing to examine her on the morning of April 8, 2020, despite being informed of her condition by Dr. Sensabaugh, and for failing to return and re-examine her condition after misdiagnosing her.[21] *Id.*

Subsequently, at 11:11 p.m. on April 9, 2020, Ms. Kaylor was examined by Ms. Pepe, "an expert certified registered nurse practitioner."[22] *Id.* at 9–10 ¶ 21; ECF 89-17 (Ms. Pepe notes). Ms. Pepe examined Ms. Kaylor due to her "complaints of pain progressing up her arm." ECF 89-17, at 2. Ms. Kaylor "complain[ed] of pain extending up her arm . . . to [her] prox[imal] humerus" and, upon examination, Ms. Pepe noted "significant erythema and edema that extend[ed] from the prox[imal] humerus to distal fingertips."[23] *Id.* Ms. Kaylor's skin had an "almost cobblestone appearance" and her fingers displayed "swelling, crusting, [and a] [v]ery limited [range of motion]." *Id.* Ms. Pepe concluded Ms. Kaylor suffered from cellulitis of the left arm and secondary sepsis.[24] *Id.* at 3. Ms. Pepe's plan was to continue antibiotic therapy, with pain

---

[21] Dr. Arrisueno is not a Movant, ECF 86, and his alleged negligence is not subject to this Motion, but Plaintiffs' allegations against Dr. Arrisueno are included here for narrative clarity.

[22] In Plaintiffs' complaint, Plaintiffs appear to have mistakenly asserted that Ms. Pepe evaluated Ms. Kaylor on April 7th or 8th, *see* ECF 1, at 9 ¶ 21; ECF 86-1, at 3 n.1. However, the parties agree Ms. Pepe evaluated Ms. Kaylor on April 9, 2020. ECF 86-1, at 3 n.1; ECF 89-1, at 9–10 (citing ECF 89-17).

[23] The humerus is "the only bone in your upper arm." *Humerus Fracture*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22990-humerus-fracture (last visited Apr. 19, 2024). "The proximal end of your humerus is the top." *Id.*

[24] Sepsis is the "body's extreme reaction to an infection" in which the "immune system stops fighting the infection and starts damaging . . . normal tissues and organs." *Sepsis*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/12361-sepsis (last visited Apr. 19, 2024).

management and elevation of the arm with continued monitoring. *Id.* Plaintiffs' expert Dr. Itskowitz will opine that Ms. Pepe breached the standard of care by "not ensur[ing] that [Ms. Kaylor] was evaluated by the surgeon for necrotizing fasciitis" when the condition "would have been in her differential." ECF 89-27, at 11, 118:11–119:18.

In sum, by the end of Ms. Kaylor's third day of hospitalization she had received both a CT scan and a surgical consultation; however, no medical professional had diagnosed her condition.

### D.   April 10, 2020: Ms. Kaylor remains undiagnosed.

On April 10, 2020, at 9:41 a.m., Dr. Addo, an expert in hospital medicine, saw Ms. Kaylor. ECF 1, at 13 ¶ 28; ECF 89-18 (Dr. Addo notes). Dr. Addo noted both Ms. Kaylor's "[l]eft upper extremity as well as [her] bilateral lower extremities [were] diffusely swollen with 3+ pitting edema." ECF 89-18, at 3. Dr. Addo's assessment included cellulitis of the arm, anemia, lower extremity edema, hyponatremia, hypokalemia, acute kidney injury, and insomnia.[25] *Id.* at 5. Plaintiffs allege that Dr. Addo negligently failed to diagnose Ms. Kaylor's necrotizing fasciitis despite her "overwhelming and progressing" symptoms of the condition and her continued sepsis despite antibiotic administration. ECF 1, at 13 ¶ 28. Plaintiffs allege Dr. Addo should have ordered a STAT surgery consultation to reevaluate her condition.[26] *Id.* Plaintiffs' expert Dr. Itskowitz will opine that Dr. Addo breached the standard of care in this manner. *See* ECF 89-27,

---

[25] Hyponatremia and hypokalemia refer to low sodium and potassium levels in the blood, respectively. *See Hyponatremia*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hyponatremia/symptoms-causes/syc-20373711 (last visited Apr. 19, 2024) ("Hyponatremia occurs when the concentration of sodium in your blood is abnormally low."); *Hypokalemia*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17740-low-potassium-levels-in-your-blood-hypokalemia (last visited Apr. 19, 2024).

[26] Additionally, Dr. Addo's notes indicate Ms. Kaylor was "unhappy with the care she [was] receiving" and "requested to be transferred to Morgantown." ECF 89-18, at 5. However, Dr. Addo noted that "after talking to her and in view of the overall covid 19 situation, she has agreed to receive further treatment here." *Id.*

at 12, 126:9–129:8 ("Dr. Addo on the 10th and the 11th was required to pursue a stat surgical

consultation. The patient was not only not getting better, but this patient was getting worse.");

ECF 89-28, at 9, 11–12, 110:14–114:11.

April 10, 2020, is an important date in the case, as Plaintiffs' expert Dr. Freed is expected

to opine that had Ms. Kaylor received surgical intervention at any point between her admission on

April 7, 2020, through the morning of April 10, 2020, Ms. Kaylor "more likely than not would

have returned to reasonable function and been able to perform her activities without permanent

disability." ECF 89-29, at 4 ¶ 11; *see also infra* Section III.A.1 (discussing Dr. Freed's testimony

in more depth). After the morning of April 10, 2020, Dr. Freed will opine that "as the 10th went

on and into the 11th, certainly there was enough tissue loss to cause a permanent deficit." ECF

89-30, at 4, 87:12–14.

### E. April 11, 2020: Ms. Kaylor leaves UPMC Hospital against medical advice and goes to a different medical center, where she is diagnosed with necrotizing fasciitis and receives surgical intervention.

On April 11, 2020, Ms. Kaylor's symptoms continued to worsen, and Ms. Kaylor decided

to leave the UPMC Hospital and drive to the emergency department of a different tertiary care

center, the West Virginia University Hospitals and University Health Associates ("WVU

Hospital"). ECF 1, at 13–14 ¶ 30; ECF 89-21 (Operative Report from WVU Hospital); 89-22

(Discharge Summary from WVU Hospital). As the WVU Hospital summarized, upon arrival,

"Plastic Surgery performed a bedside debridement with cultures remaining negative." ECF 89-

22, at 2; *see also* ECF 89-20 (WVU Hospital surgeon notes). WVU Hospital medical professionals

ordered a "CT [of Ms. Kaylor's] bilateral upper extremities [which] showed diffuse soft tissue

edema and swelling of the left upper extremity without loculated, drainable collection or soft tissue

air." ECF 89-22, at 2. Ms. Kaylor "was urgently taken to the operating theatre for fasciotomies

of the dorsal hand, dorsal forearm, volar forearm with carpal tunnel release, washout and packing

to the wound." *Id.* Ms. Kaylor remained in the hospital until April 17, 2020. *Id.*; ECF 1, at 14 ¶ 31.

Ms. Kaylor alleges that following her discharge, she received home health services to manage her IV antibiotic therapy until April 25, 2020. ECF 1, at 14 ¶ 31. Ms. Kaylor was left with "minimal use of her left hand and arm due to extensive muscle loss, significant scarring, and chronic pain." *Id.* ¶ 32. As a result of her disability, she can no longer work or drive a car, and she requires assistance for basic activities. *Id.*; *see also* ECF 89-31 (Plaintiffs' Expert, Dr. Michael April notes), at 2–4 (opining on damages); ECF 89-24 (Plaintiffs' preliminary Rule 26(a)(2) disclosure), at 20–21.

## II. **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

A medical malpractice tort is essentially the same as a "traditional negligence claim." *Am. Radiology Servs. v. Reiss*, 236 A.3d 518, 531 (Md. 2020); *Armacost v. Davis*, 200 A.3d 859, 872 (Md. 2019) (citations and quotation marks omitted). Thus, "the general principles which ordinarily govern in negligence cases also apply in medical malpractice claims." *Reiss*, 236 A.3d at 531

14

(quoting *Armacost*, 200 A.3d at 872).   Accordingly, in Maryland,[27] "[t]o prevail in a medical malpractice negligence action, a plaintiff must prove four elements: '(1) the defendant's duty based on an applicable standard of care, (2) a breach of that duty, (3) that the breach caused the injury claimed, and (4) damages.'"[28] *Frankel v. Deane*, 281 A.3d 692, 703 (Md. 2022) (quoting *Reiss*, 236 A.3d at 531); *see also Reiss*, 236 A.3d at 521 (noting the longstanding principle that "all persons are presumed to have duly performed any duty imposed on them" and therefore "negligence cannot be presumed, but must be affirmatively proved" (quoting *State ex rel. Janney v. Housekeeper*, 16 A. 382, 384 (Md. 1889))).   At this stage, Movants challenge only the element of causation. *See* ECF 86-1, at 14.

To establish the element of causation in a medical malpractice case, plaintiffs generally must present expert testimony. *Reiss*, 236 A.3d at 532; *Adventist Healthcare, Inc. v. Mattingly*,

---

[27] A federal court sitting in diversity applies the substantive law of the state in which it sits. *Megaro v. McCullum*, 66 F.4th 151, 159 n.4 (4th Cir. 2023) (citing *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004)). Accordingly, the Court applies Maryland's substantive law in considering the present motion.

[28] While Maryland law "sets out the substantive elements of medical malpractice cases arising through diversity jurisdiction, 'whether there is sufficient evidence to create a jury issue' regarding the element of causation 'is controlled by federal rules.'" *Riggins v. SSC Yanceyville Operating Co., LLC*, 800 F. App'x 151, 155 (4th Cir. 2020) (quoting *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982)); *see also Jordan v. Iverson Mall Ltd. P'ship*, No. GJH-14-37, 2018 WL 2391999, at *5–7 (D. Md. May 25, 2018) ("[T]here is no requirement that an expert use any 'magic words' for their opinion to be admissible. However, the expert's testimony taken as a whole must still demonstrate that the expert is confident in his or her opinion to a reasonable degree of certainty. . . ."). The parties appear to either rely upon Maryland law for determining the sufficiency of the expert testimony, or they appear to treat the standards as coextensive. *See* ECF 86, at 11–12 (citing Maryland caselaw for the proposition that expert testimony must be "sufficiently definite and certain to be admissible" though also citing Rule 702 of the Federal Rules of Evidence governing the admissibility of expert testimony); ECF 86-1, at 8 (using "medical certainty" and "medical probability" interchangeably); ECF 89, at 23–27 (citing exclusively to Maryland cases in argument). In any event, as I explain below, Movants appear to concede the admissibility of Dr. Freed's opinion that surgical intervention by the morning of April 10, 2020, more likely than not would have resulted in Ms. Kaylor recovering without permanent disability. *See infra* note 30.

223 A.3d 1025, 1038 (Md. App. 2020); *Rodriguez v. Clarke*, 926 A.2d 736, 755 (Md. 2007)

("Because the gravamen of a medical malpractice action is the defendant's use of suitable

professional skill, which is generally a topic calling for expert testimony, this Court has repeatedly

recognized that expert testimony is required to establish negligence and causation.") (internal

citations and quotation marks omitted)); *Meda v. Brown*, 569 A.2d 202, 206–07 (Md. 1990) ("[I]n

the ordinary medical malpractice case, because of the complexity of the subject matter, expert

testimony is required to establish negligence and causation."); *see also Young v. United States*,

667 F. Supp. 2d 554, 562 (D. Md. 2009) ("[T]he Court may find adequate evidence to create a

triable issue of fact with respect to causation only if expert opinion evidence establishes to a

reasonable degree of medical certainty that defendant's negligence was more likely the cause of

plaintiff's injuries than any other cause."); *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 164 n.2

(4th Cir. 1988) ("[E]xpert opinion is of course the prime—indeed usually the only—way to prove

medical causation."); *Green v. Obsu*, Civ. No. ELH-19-2068, 2022 WL 2971950, at *20–21 (D.

Md. July 27, 2022) (discussing general requirement of expert testimony in medical malpractice

actions in Maryland).   In other words, a jury cannot make inferences based only on *res ipsa*

*loquitor*—there must be some expert testimony supporting the inference that the medical

negligence caused an injury. *See Frankel*, 281 A.3d at 710 (citing *Meda*, 569 A.2d at 203).

To establish causation, a plaintiff must prove a defendant's negligence is both a (1) cause-

in-fact of the injury and (2) a legally cognizable cause. *Pittway Corp. v. Collins*, 973 A.2d 771,

786 (Md. 2009); *Copsey v. Park*, 160 A.3d 623, 636 (Md. 2017); *Young*, 667 F. Supp. 2d at 561

(citing *Stickley v. Chisholm*, 765 A.2d 662, 668 (Md. App. 2001)); *Pippin v. Potomac Elec. Power*

*Co.*, 132 F. Supp. 2d 379, 392–93 (D. Md. 2001), *aff'd sub nom. Pippin v. Reilly Indus., Inc.*, 64

F. App'x 382 (4th Cir. 2003).   "Cause-in-fact" concerns whether a defendant's negligent conduct

16

actually produced an injury. *Pittway Corp.*, 973 A.2d at 786; *Copsey*, 160 A.3d at 636. "Legal causation," in contrast, is "a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established." *Pittway Corp.*, 973 A.2d at 786.

Movants argue that Plaintiffs have failed to demonstrate via expert testimony that each Movant was a cause-in-fact of Ms. Kaylor's injuries. *See* ECF 86-1, at 14–16 (applying the "substantial factor" test, a test for determining causation-in-fact). "The causation-in-fact inquiry asks 'whether defendant's conduct actually produced an injury.'" *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 453 (D. Md. 2019) (quoting *Pittway Corp.*, 973 A.2d at 786). "Maryland courts have developed two tests to determine whether the requisite causation exists: the 'but-for test' and the 'substantial factor' test." *Id.* (quoting *Pittway Corp.*, 973 A.2d at 786).

"Under the but-for test, the requisite causation exists when the injury would not have occurred but for the defendant's conduct." *Id.* (quoting *Pittway Corp.*, 973 A.2d at 786). This test applies when there is only one tortfeasor or negligent act at issue. *Id.* (citing *Pittway Corp.*, 973 A.2d at 786); *Sindler v. Litman*, 887 A.2d 97, 110 (Md. App. 2005) (noting the "but-for" test does not resolve situations in which "two independent causes concur to bring about an injury, and either cause standing alone would have wrought the identical harm"); *Yonce v. SmithKline Beecham Clinical Lab'ys, Inc.*, 680 A.2d 569, 575–76 (Md. App. 1996).

When there are numerous alleged tortfeasors, Maryland courts apply the "substantial factor" test to determine which tortfeasors were the cause-in-fact of a single injury.[29] *Pittway Corp.*, 973 A.2d at 787; *Young*, 667 F. Supp. 2d at 561; *Yonce*, 680 A.2d at 576. "Under the substantial factor test, the requisite causation may be found if it is 'more likely than not' that the

---

[29] Importantly, numerous negligent actions may constitute the proximate cause of a harm. *Young*, 667 F. Supp. 2d at 561; *Atl. Mut. Ins. Co. v. Kenney*, 591 A.2d 507, 512 (Md. 1991); *Karns v. Liquid Carbonic Corp.*, 338 A.2d 251, 262 (Md. 1975).

defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Exxon Mobil Corp.*, 406 F. Supp. 3d at 453 (quoting *Copsey*, 160 A.3d at 636); *Pittway*, 973 A.2d at 787.

In determining whether the requisite connection exists under the substantial factor test, the following considerations are relevant:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces of which the actor is not responsible;
>
> (c) lapse of time.

*Pittway*, 973 A.2d at 787 (quoting Restatement (Second) of Torts § 433 (1965)); *Exxon Mobile Corp.*, 406 F. Supp. 3d at 453; *Sindler*, 887 A.2d at 110; *Yonce*, 680 A.2d at 576. "Regardless of the test employed, the focus remains on the fundamental and sometimes metaphysical inquiry into the nexus between the defendant's negligent act and the resultant harm to the plaintiff." *Yonce*, 680 A.2d at 576.

## A.   Movants' arguments do not persuade.

Movants argue that even if Drs. Pilla, Flint, and Sensabaugh, as well as Mr. Kuhn and Ms. Pepe did breach the standard of care by failing to get a STAT CT and surgical consultation, that these alleged breaches were remedied early enough in time to avoid Ms. Kaylor's permanent injuries.[30] ECF 86-1, at 14. In other words, even if the STAT CT and surgical consultation should

---

[30] It is less clear if Movants are challenging the admissibility of Dr. Freed's testimony. On the one hand, Movants provide the legal standard for the admissibility of expert testimony, ECF 86-1, at 11, and in setting out the factual background Movants note that Dr. Freed's level of certainty concerning some medical opinions appeared to change mid-deposition, ECF 86-1, at 8. However, in argument, Movants appear to concede the admissibility of Dr. Freed's testimony for purposes of this motion, by relying on Dr. Freed's opinion that the morning of April 10, 2020, was the "line in the sand" for when surgical intervention could have prevented Ms. Kaylor's permanent disability. *See* ECF 86-1, 14–16; *see also* ECF 86-1, at 16 (arguing only generally that Plaintiffs'

have come sooner, Ms. Kaylor received both a CT and surgical consultation on April 9, 2020, a day before the proverbial "line in the sand" Dr. Freed drew on the morning of April 10, 2020, as the point of no return for her permanent injuries. *Id.* at 15. Because all the alleged breaches were rectified before permanent injuries set in, Movants argue that this proves their breaches were not a cause-in-fact of Ms. Kaylor's injuries. *Id.*

This argument does not persuade for two reasons: (1) a reasonable jury could understand Dr. Freed's testimony to indicate a sliding scale of harm, not a "line in the sand"; and (2) a reasonable jury could conclude that the outcome of the CT and surgical consultation would have been different had the Movants not breached their standard of care.

        1.    A jury can construe Dr. Freed's testimony in at least two reasonable ways.

Dr. Freed called Ms. Kaylor's condition a "Class 1 emergency," which is one where "life and limb are at stake. It takes precedence in an operating room over everything else." ECF 89-30, at 3, 75:10–14. In Dr. Freed's deposition, when asked whether earlier surgery would have changed the outcome, he said:

> So I can compare necrotizing fasciitis to cancer. Everybody knows that the earlier you operate on cancer the more likely you are to cure the patient. The patient will suffer less the earlier you operate. Necrotizing fasciitis is exactly the same. The earlier you operate the less tissue there is lost and the more likely it is that the patient will return to full function in the future. The longer the delay, the more tissue dies

experts' opinions are not specific enough as they do not refer to each Movant individually, not that the opinions lacked the requisite level of certainty). Given Movants' reliance on the admissibility of such evidence in argument, I will treat the admissibility of Dr. Freed's testimony as undisputed for purposes of the motion. *See* Fed. R. Civ. P 56(c)(2) (noting that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); Fed. R. Civ. P 56(e)(2) (noting when a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"). Thus, I will assume Dr. Freed's testimony that surgical intervention by the morning of April 10, 2020, more likely than not would have staved off Ms. Kaylor's permanent disability is admissible. *See also infra* Sections III.A.1, III.B (discussing permissible inferences drawn therefrom and the role of Dr. Freed's testimony in Plaintiffs' prima facie medical malpractice claim).

and the more tissue dies the more likely it is that we will have a permanent disability
from the infection. That's my opinion.

*Id.* at 4, 85:18–86:12. When asked whether the outcome would have been different had surgery

occurred on April 9, 2020, as opposed to April 11, 2020, Dr. Freed stated: "I think that if the

surgery had occurred on the 9th, more likely than not she would have returned to full function, had

another 48 hours not transpired before her compartments would be compressed and all the necrotic

tissue removed." *Id.*, at 4, 86:13–22. In Dr. Freed's opinion, the surgery should have occurred

"[t]he very first time that they saw the blister, swollen, red, ascending infection," which was from

the moment Ms. Kaylor arrived in the emergency room and was examined. *Id.* at 5, 97:14–98:14.

When asked whether surgery on the 10th or 11th would have made a difference in Ms. Kaylor's

deficits Dr. Freed stated that "[p]robably as late as the morning of the 10th, she probably would

have recovered to complete function. But as the 10th went on and into the 11th, certainly there

was enough tissue loss to cause a permanent deficit." *Id.* at 4, 87:1–14.

Movants read Dr. Freed's testimony as tantamount to saying that Ms. Kaylor would have

no permanent injuries had she received surgical intervention on the morning of April 10th. ECF

89-1, at 15. However, Dr. Freed's comparisons of this disease to cancer, and his commonsense

statement that the "earlier you operate the less tissue there is lost and the more likely it is that the

patient will return to full function in the future" could lead a reasonable jury to view this disease's

progression as a sliding scale of harm, one where time was of the essence. *See* ECF 89-30, at 4,

85:22–86:12. In such a case, every hour Ms. Kaylor was undiagnosed was another hour where a

necrotic infection was eating away at her tissue, ultimately requiring a greater amount of tissue to

be surgically removed. *See* ECF 89-30, at 7, 110:10–12 (Dr. Freed stating "[t]he one thing is I

testified to several times today already is that time is of the essence"). Because a jury could

reasonably read Dr. Freed's testimony in this manner, the Court is obliged to view the evidence in

the light most favorable to the nonmoving party and draw all reasonable inferences in Plaintiffs'

favor. *See Tolan*, 572 U.S. at 657. As such, the Court cannot find that Movants' negligence was

harmless as a matter of law.

>     2.   A jury can draw different conclusions about whether Ms. Kaylor would be
>          less permanently impaired had she obtained an earlier CT scan and surgical
>          consultation.

Next, Movants argue that an earlier CT scan and surgical consultation would not have

changed Ms. Kaylor's outcome because Dr. Arrisueno would have—as they argue he did for

purposes of their motion—misdiagnosed Ms. Kaylor regardless of when he engaged in the

consultation.[31] *See* ECF 86-1, at 14. Since Dr. Arrisueno was the surgical consultant and was

---

[31] This argument borders on a related but separate argument of superseding causation. The fact
that a surgical consultation obtained on April 9, 2020, did not result in an emergency surgical
intervention is essentially an argument of supervening causation, because it points the finger at the
alleged negligence of Dr. Arrisueno, the surgical consultant. ECF 86-1, at 15. To the extent
Movants rely on this reasoning, such an analysis only comes after one determines that the
antecedent negligence was, in fact, a cause-in-fact of the injury. *See Pittway Corp.*, 973 A.2d at
788 (noting that only after determining whether "multiple negligent acts or omissions are [] a
cause-in-fact of a plaintiff's injuries" does a court assess the foreseeability analysis, which
"involve[s] an inquiry into whether a negligent defendant is relieved from liability by intervening
negligent acts or omissions"); *Young*, 667 F. Supp. 2d at 566. "[A] superseding cause arises
primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that
could not have been anticipated by the original tortfeasor." *Pittway Corp.*, 973 A.2d at 789–90
(quoting *McGowans v. Howard*, 197 A.2d 915, 918 (Md. 1964)); *Young*, 667 F. Supp. 2d at 566.
Because Movants have not expressly alleged that Dr. Arrisueno's negligence was a superseding
cause, the Court need not delve into this alternate argument. *See* ECF 86.

Movants' point is also somewhat undercut as to Dr. Pilla, Dr. Flint, and Mr. Kuhn, as
Plaintiffs point to an on-call schedule for the week of Ms. Kaylor's hospitalization, indicating that
Dr. Arrisueno would not have been the on-call surgeon on April 7, 2020. *See* ECF 89-33. This
would support the inference that if a reasonably prudent on-call surgeon would have been called,
Ms. Kaylor's illness would have been diagnosed by April 7, 2020. *See id.* (indicating Dr. Chisholm
was on call on April 7, 2020, and Dr. Arrisueno was on call April 8–12, 2020). Given that another
doctor was on call on April 7, 2020, a reasonable jury could conclude that Drs. Pilla and Flint, and
Mr. Kuhn, who each observed Ms. Kaylor on April 7, 2020, were a substantial factor in Ms.
Kaylor's permanent disability.

presumably in the best position to diagnose necrotizing fasciitis,[32] Movants essentially argue that his failure to properly diagnose Ms. Kaylor made it such that Ms. Kaylor's outcome would have remained the same regardless of whether Movants had met their duty of care. *See id.* While it is possible a jury could be convinced of such, Plaintiffs offer enough evidence to suggest that Ms. Kaylor's outcome could have been different had the Movants not breached the standard of care. Stated differently, what would have happened had Movants acted within the standard of care and whether Ms. Kaylor would have been diagnosed sooner is a question of fact that cannot be determined at this stage.

Specifically, Plaintiffs' experts testify that necrotizing fasciitis is a condition that can only be diagnosed definitively in an operating room. ECF 89-27, at 10, 110:5–16. Plaintiffs' experts testify that the standard of care requires medical professionals with a reasonable suspicion of the disease to order a STAT CT and STAT surgical consultation. ECF 89-26, at 3–4, 84:4–97:17 (regarding Mr. Kuhn and Dr. Flint); ECF 89-27, at 5–8, 77:17–102:15 (regarding Dr. Pilla and Dr. Sensabaugh); ECF 89-27, at 11–12, 119:3–126:12 (regarding Ms. Pepe); ECF 89-28, at 7, 85:3–89:14 (regarding Dr. Ali); ECF 89-28, at 10, 106:20–111:14 (regarding Dr. Addo).

A prerequisite to that, of course, is suspecting the disease when there is sufficient evidence of the disease. Plaintiffs' experts indicate that as soon as the 7th, a reasonably prudent medical professional should have been concerned for necrotizing fasciitis and acted to rule out the life-threatening infection. *See, e.g.*, ECF 89-26, at 3–4, 84:7–97:17 (opining as to Mr. Kuhn and Dr.

---

[32] This presumption is inherent in expert testimony that necrotizing fasciitis can only be definitively diagnosed in surgery, ECF 89-27, at 10, 110:6–8, and it is inherent in expert testimony that the standard of care requires a surgical consultation because surgeons would be in the best position to make the definitive diagnosis in the operating room. *See, e.g.*, ECF 89-28, at 4, 64:12–20 (discussing the standard of care requiring a stat surgical consultation when there are suspicions of a surgical emergency).

Flint, who evaluated Ms. Kaylor on April 7, 2020); ECF 89-27, at 5–6, 77:17–78:1 (opining as to

Dr. Pilla, who evaluated Ms. Kaylor on April 7, 2020). Thus, Plaintiffs' experts opine that medical

professionals on April 7th breached the standard of care by failing to recognize Ms. Kaylor was

presenting with classic signs of necrotizing fasciitis.[33]  ECF 89-26, at 3–4, 84:7–97:17; ECF 89-

27, at 5–6, 77:17–78:1.

So too the medical professionals on April 8, 2020, were required to recognize the risk of

necrotizing fasciitis and order a STAT CT and STAT surgical consultation.  ECF 89-27, at 7–8,

97:5–9 (as to Dr. Sensabaugh); *id.* at 11–12, 119:3–126:12 (as to Ms. Pepe); ECF 89-28, at 7,

85:3–89:8 (as to Dr. Ali).  While Dr. Arrisueno was the on-call surgical consult from April 8, 2020,

through April 11, 2020, ECF 89-33, Dr. Arrisueno's notes do not indicate that he considered a

diagnosis of necrotizing fasciitis, ECF 89-16, at 2–3.  A reasonable jury may, therefore, be

persuaded that had Movants acted within the standard of care on April 8, 2020, they would have

presented Dr. Arrisueno with the concern of necrotizing fasciitis, and a jury may infer that those

conversations would have influenced Dr. Arrisueno's opinion, resulting in a swifter diagnosis.

Moreover, such conversations would have occurred against the backdrop of Plaintiff's continued

failure to respond to treatment for conditions she didn't have, thus providing an additional reason

for a jury to conclude that the course of Plaintiff's treatment may have proceeded differently had

Movants presented the concern of necrotizing fasciitis sooner.

This inference is supported by expert testimony regarding the nature of necrotizing fasciitis

and its method of diagnosis.  Plaintiffs' experts will testify that diagnosing a patient with

---

[33] As to these Movants, Plaintiffs have established that a different surgeon was on-call and have presented expert testimony that had "any reasonably prudent surgeon" been consulted, the reasonably prudent surgeon would have diagnosed Ms. Kaylor's infection and immediately either operated or found another surgeon to immediately surgically intervene. *See* ECF 89-29, at 3 ¶ 10.

necrotizing fasciitis is not a binary that is confirmable, for instance, with a simple test. *See* ECF 89-27, at 6, 78:15–18 (noting "the imaging study is not a definitive diagnosis of necrotizing soft tissue infection," rather it is "the surgical exploration that provides the definitive diagnosis"). It is an illness that requires professional expertise and diagnostic judgment to catch. *See id.* 81:8–18 (noting physicians "don't rely upon a radiology interpretation to rule out necrotizing fasciitis" because the diagnosis comes from "the combination of severe clinical findings, and most importantly . . . the surgical findings"); ECF 89-28, at 4, 64:5–20 (noting that in some cases "when you're concerned about a surgical emergency, even before you have the imaging . . . you need to have the surgeon involved[.]"). Doctors must look both at laboratory results and the patient's clinical presentation, and even still, the illness can only be confirmed with surgical intervention. *See* ECF 89-27, at 6, 81:10–12. Therefore, a reasonable jury can draw different inferences about what would have happened had Ms. Kaylor received a STAT surgical consultation informed by other medical professionals' concerns of necrotizing fasciitis.

The only Movant whose alleged negligence came after Dr. Arrisueno's non-urgent surgical consultation was Dr. Addo's, who visited Plaintiff on the morning of April 10, 2020. ECF 1, at 13 ¶ 28. Movants argue that Dr. Addo was too late to change the outcome of Ms. Kaylor's injuries because, as noted above, Dr. Freed drew a "line in the sand" on the morning of April 10, 2020, such that after that the permanent damage set in. ECF 86-1, at 14–15. Additionally, because Plaintiffs' expert Dr. McMeeking[34] estimated it can take one to three hours to obtain a surgical

---

[34] Dr. Alexander McMeeking, an expert in infectious disease, is one of Plaintiffs' designated causation and damages experts. *See* ECF 89-24, at 11–14; *see also* 86-7 (Dr. McMeeking deposition), at 1–6. Dr. McMeeking is expected to opine about Dr. Thapa's breaches causing Plaintiffs' disability, ECF 89-24, at 11–14; ECF 86-7, at 5, 180:6–16. Dr. McMeeking's opinions do not feature prominently in the parties' arguments on the present motion as Dr. Thapa is not one of the Movants. *See* ECF 86.

consultation, ECF 86-7, at 6, 184:11–16, Movants reason it was simply too late for Dr. Addo to make a difference. ECF 86-1, at 14–15. Again, a reasonable jury could be persuaded that injuries from necrotizing fasciitis can be assessed on a sliding scale and could infer that every additional hour without proper treatment causes more harm. *See supra* Section III.A.1. But even if this "line in the sand" interpretation persuaded the jury, Plaintiffs have still established a genuine dispute of material fact as to how long it would have taken to get Ms. Kaylor in an operating room. The UPMC Hospital submitted via admission that an on-call trauma surgeon is available within thirty minutes and that a surgeon was available for a STAT consultation within *one* hour, not three. ECF 89-12, at 3. At the very least, this creates another genuine dispute of material fact as to how long it would have taken Dr. Addo to order a consult and get Ms. Kaylor into an operating room, and a dispute of fact as to whether that time would have been sufficient to prevent Ms. Kaylor's permanent disabilities.

> **B.   Plaintiffs have established a prima facie showing of medical negligence.**

Plaintiffs argue that they provide sufficient evidence to support a jury's finding of medical negligence. ECF 89-1, at 25–27. Movants counter that the only expert testimony on the issue of causation is too general to support a causal inference. ECF 86-1, at 14–15. I agree with Plaintiffs that there is sufficient evidence supporting a causal inference when the evidence is viewed in a light most favorable to Plaintiffs. *Tolan*, 572 U.S. at 657; *Scott*, 550 U.S. at 378.

> 1.   *Adventist Healthcare Inc. v. Mattingly* is persuasive.

Plaintiffs analogize this case to *Adventist Healthcare Inc. v. Mattingly*, 223 A.3d 1025 (Md. App. 2020). ECF 89-1, at 24. In *Mattingly*, the plaintiffs alleged that following bowel surgery, a defendant surgeon (Dr. Anand) failed to timely diagnose and treat a post-surgical bowel leak that led to sepsis and caused the decedent's death. *Id.* at 1026. Additionally, a nurse (Nurse Matilukuro) employed by the defendant hospital failed to move with urgency to escalate the

decedent's care after the defendant surgeon failed to respond to multiple telephone calls. *Id.* at 1028–31.   On appeal, the defendant hospital argued that plaintiffs failed to present expert testimony on the issue of causation and claimed that the circuit court erred in denying their motion for judgement notwithstanding the verdict. *Id.* at 1038.

The Appellate Court held that, in fact, there was "more than sufficient" evidence to establish the element of causation. *Id.* at 1039.   The plaintiffs in *Mattingly* presented expert witnesses who opined on the standard of care, indicating that a leaking bowel is a surgical emergency that requires an immediate operation.  *Id.*  The expert witnesses opined that based on the patient's reported symptoms, the nurse was required to alert the Rapid Response Team[35] by 8:30 a.m., at the latest.  *Id.*  Additionally, the experts opined that if the decedent's emergency operation to address the leaking bowl had been performed by 10:00 a.m., which it was not, the decedent would have survived.  *Id.* at 1028, 1039.  In *Mattingly*, there were no independently designated "causation experts"; however, the Court held there was sufficient evidence for a jury to find causation because when a particular medical condition is deemed critical and the standard of care requires *immediate* operation, a lay person can reasonably infer that the lack of an immediate, critical operation coupled with an immediate and predictable injury suffices to establish causation. *See id.* at 1039–40.

This is precisely what Plaintiffs have provided. Dr. Freed, Plaintiffs' designated causation expert, opined "to a reasonable degree of medical probability that had the [] surgical intervention occurred at any time between April 7, 2020 and the morning of April 10, 2020, then [Ms.] Kaylor

---

[35] In *Mattingly*, the nurse was required under the Hospital's Chain of Command policy to alert a "Rapid Response Team or Code Blue Team" to respond to situations of "medical emergencies," defined as "life-threatening issue[s]" that require "immediate intervention."  223 A.3d at 1039 (alteration in original).

more likely than not would have returned to reasonable function and been able to perform her activities without permanent disability." ECF 89-29, at 4 ¶ 11. At bottom, Plaintiffs allege that each Movant breached their applicable standard of care, which delayed the diagnosis of necrotizing fasciitis, and that the delay in diagnosis permitted Ms. Kaylor's necrotizing infection to progress and spread. *See* ECF 1, at 15–16 ¶ 33–34; ECF 89-30, at 4, 85:22–86:12 (comparing necrotizing fasciitis to a cancer that spreads); ECF 89-28, at 11, 110:11–13 ("[T]he sooner surgical intervention would have been done, the overall better the outcomes."). Plaintiffs' experts have opined that Ms. Kaylor's condition required *immediate* surgical intervention. ECF 89-29, at 3 ¶ 9; ECF 89-28, at 6, 78:4–6 ("[T]his was . . . considered a surgical emergency[.]"). It is a condition that imperils "life and limb" and it is a "Class 1 emergency" taking precedence over *all* other surgeries. ECF 89-30, at 3, 75:10–14 (emphasis added); ECF 89-28 (Dr. Elizabeth Van Opstal), at 6, 78:17–21 ("[I]f you have a reasonable concern for necrotizing fasciitis, everything needs to be done stat[.]"). A lay person can reasonably infer that the lack of an immediate, critical surgical intervention coupled with an immediate and predictable injury—namely, more necrotic flesh and more loss of tissue—suffices to establish causation. ECF 89-30, at 4, 86:8–11 (noting "the longer the delay, the more tissue dies and the more tissue dies the more likely it is that we will have a permanent disability").

Movants attempt to distinguish *Mattingly* by claiming that Movants' alleged breaches were eventually remedied when Ms. Kaylor received a CT scan on the morning of April 9, 2020, and a surgical consultation during the afternoon of April 9, 2020, both of which occurred before the proverbial "point of no return" on April 10, 2020. ECF 90, at 2. However, these arguments do not persuade because Plaintiffs' expert testimony may convince a jury that Ms. Kaylor's condition worsened during the delay when Ms. Kaylor was misdiagnosed. *See supra* Section III.A.

27

2.   Dr. Freed's Testimony is sufficiently specific to satisfy Plaintiff's burden of
establishing prima facie evidence of causation.

Movants also argue that Dr. Freed's testimony is "so general as to be meaningless," ECF

86-1, at 14. Movants argue it is impossible for the jury to apportion the amount of necrotic decay

per day, or per hour based on Dr. Freed's testimony. *See id.* (arguing Dr. Freed "could not quantify

or explain how [Ms.] Kaylor's outcome would have been different with any specificity"). Movants

attempt, therefore, to cast Dr. Freed's testimony as a binary where either Ms. Kaylor could or could

not avoid permanent disability with surgical intervention. *See id.*

It is true that Dr. Freed does not, for instance, describe how quickly necrotic infections

spread—beyond generally classifying them as life-threatening emergencies. *See* ECF 89-30, at 3–

4, 75:10–86:12. It is also true that Dr. Freed does not specify different levels of disability that may

result depending upon when Ms. Kaylor was diagnosed—beyond generally opining that operating

earlier is better and that permanent disability more likely than not could have been avoided with

surgical intervention on April 7 and 8, 2020. ECF 89-30, at 4, 86:1–12. However, Movants have

not identified caselaw indicating that this testimony is insufficient as a matter of law. ECF 86-1,

at 14–16. The only case Movants cite in support of this proposition is *Porter Hayden Co. v. Wyche*,

738 A.2d 326 (Md. App. 1999). *See* ECF 86-1, at 16. However, as explained next, *Porter* is

distinguishable.

In *Porter*, after a defendant was adjudged liable for a plaintiff's asbestos-related lung

cancer, the trial court ruled as a matter of law that the plaintiff's expert testimony about the genesis

of the cancer sufficiently established that the plaintiff's lung cancer pre-dated Maryland's passage

of a statutory cap on noneconomic damages. *Id.* at 328. The Appellate Court reversed, holding

that the expert's testimony as to the genesis of the plaintiff's cancer was too speculative to support

the trial court's determination that the cancer pre-dated the statutory cap legislation in 1986 as a

28

matter of law. *Id.* at 330. The expert testimony stated only that the cancer probably began between five to ten years prior and "toward the longer interval of that five to ten-year window." *Id.* This left the jury to speculate as to whether the cancer pre-dated the law, because if the cancer began seven years prior to the plaintiff's diagnosis in 1993, then the statutory cap would not apply, whereas if the cancer began six years prior to his diagnosis, the cap would apply. *Id.* Thus, because the expert's opinion testimony, even if credited by a jury, would leave the jury to guess as to when the cancer began, the expert testimony was adjudged insufficient as a matter of law. *Id.* at 330–31.

By contrast, here, there is no speculation as to whether delays in Ms. Kaylor's diagnosis caused her harm—Dr. Freed unequivocally testified that they did. *See, e.g.*, ECF 89-30, at 4, 85:22–86:12 (comparing necrotizing fasciitis to cancer); *see also supra* Section III.A.1 (explaining that a reasonable jury could understand Dr. Freed's testimony to describe a sliding scale approach to the harm caused by delays to Ms. Kaylor's surgery). There is a material difference between *Porter*, where the jury would have to guess at a material fact that would determine whether or not a statutory cap applied, *see id.*, and this case, where the jury does not have to guess to determine that delays in diagnosing Ms. Kaylor caused her harm, ECF 89-30, at 4, 85:22–86:12. Dr. Freed unequivocally opined that "if the surgery had occurred on the 9th, more likely than not she would have returned to full function, had another 48 hours not transpired before her compartments would be compressed and all the necrotic tissue removed."[36] ECF 89-30, at 4, 86:13–22. This is sufficiently specific as to all Movants that allegedly breached their duties on April 7, 8, and 9, 2020 (Drs. Flint, Pilla, Sensabaugh, Ali, and Mr. Kuhn and Ms. Pepe).

---

[36] Dr. Freed was also unequivocal that on April 11, 2020, there was "certainly enough tissue loss to cause a permanent deficit." ECF 89-30 at 4, 87:12–14.

Dr. Freed's testimony is also sufficiently specific to encompass Dr. Addo's alleged negligence on April 10, 2020. No doubt, Dr. Freed's least specific and least certain opinion related to picking the latest point in time when permanent disability could have been avoided. *See id.* 87:14–15 ("Again this is a crystal ball. You're asking me to estimate."). Dr. Freed estimated that Ms. Kaylor more likely than not would have avoided permanent disability had she been operated on by the morning of April 10, 2020. ECF 89-29, at 4 ¶ 11; ECF 89-30, at 4, 87:10–14. The "morning of" April 10, 2020, could be considered a term that invites speculation, just as the expert in *Porter* invited speculation by opining that the cancer began during the "longer interval of that five to ten-year window." *See Porter*, 738 A.2d at 330.

Yet even if Dr. Freed's testimony invites speculation as to whether Dr. Addo could have caught Ms. Kaylor's necrotizing fasciitis and avoided permanent disability altogether, a jury can nevertheless still reasonably infer that the permanent disability Ms. Kaylor now has is *worse than it would have been* had Dr. Addo not breached his duty on April 10, 2020. If the jury credits Dr. Freed's testimony that "the longer they delay, the more tissue dies," ECF 89-30, at 4, 86:8–12, a jury can reasonably conclude that the *amount* of tissue that had to be excised and the *level* of Ms. Kaylor's current disability is causally related to Dr. Addo, as well.

In sum, Plaintiffs have met their burden to establish a prima facie case of medical negligence because a jury could reasonably conclude that (1) Ms. Kaylor had necrotizing fasciitis when she arrived on April 7, 2020, ECF 89-29, at 3 ¶ 8; (2) Ms. Kaylor's symptoms were sufficiently alarming as to alert a reasonably prudent medical professional of the potential condition, ECF 89-25, at 3–4, 73:14–78:2 (opining as to Mr. Kuhn and Dr. Flint); ECF 89-27, at 7, 97:5–9 (opining as to Dr. Sensabaugh); ECF 89-27, at 10–12, 111:7–129:8 (opining as to Dr. Ali, Dr. Addo and Ms. Pepe); (3) had a reasonably prudent medical professional suspected the

condition, they would have ordered a STAT surgical consultation and a STAT CT, ECF 89-25, at

3–4, 73:14–78:2; ECF 89-27, at 7, 97:5–9; ECF 89-28, at 10–12, 111:7–129:8; and (4) had any

Movant done so, any reasonably prudent surgeon would have taken Ms. Kaylor to an operating

room, confirmed her diagnosis, and immediately surgically intervened. ECF 89-29, at 3 ¶ 10; *see*

*also* ECF 89-12 (UPMC Hospital Admissions), at 3 (acknowledging "an on-call trauma surgeon

was available within 30 minutes of being called" and "a general surgeon was available within one

hour of a STAT request for surgical consultation"); ECF 89-21 (Ms. Kaylor's Operative Report

from WVU Hospital), at 2–3 (indicating Ms. Kaylor's necrotizing fasciitis is a "surgical

emergency and [that] she [was] taken directly from the emergency room to the OR"). Additionally,

it appears to be a dispute of fact as to whether earlier surgery for Ms. Kaylor would have resulted

in less tissue removal and thus less extensive permanent disabilities. ECF 89-29, at 4 ¶ 11; ECF

89-30, at 4, 1–12. It is not my role to settle this dispute at this stage.

Ultimately, causation is a question that ordinarily goes to a jury. *See Coles v. Jenkins*, 34

F. Supp. 2d 381, 388 (W.D. Va. 1998); *In re Lone Star Indus. Inc., Concrete R.R. Cross Ties Litig.*,

882 F. Supp. 482, 496 (D. Md. 1995) ("Once the opinion of a qualified expert is admitted in

evidence, the causation issue is for the trier of fact."). "Whether or not a defendant's negligence

proximately caused an accident 'becomes a question of law only when the evidence is such that

there can be no difference in the judgment of reasonable [people] as to the inferences to be drawn

from it.'" *Coles*, 34 F. Supp. 2d at 388 (quoting *Scott v. Simms*, 51 S.E.2d 250, 253 (Va. 1949))).

This is not the case here, as jurors could reasonably draw different conclusions as to the inferences

herein. One reasonable inference a jury could draw is that each Movant was a substantial cause in

Ms. Kaylor's injuries. As the facts are not "so one-sided that one party must prevail as a matter of

law," *Anderson*, 477 U.S. at 251–52, I find the evidence Plaintiffs submit "presents a sufficient disagreement to require submission to a [trier of fact]." *Id.*

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Movants' motion for summary judgment at ECF 86 is **DENIED**.  A separate implementing Order will issue.

Dated: <u>May 8, 2024</u>

/s/

Brendan A. Hurson
United States District Judge